EXHIBIT 1

Neutral Citation Number: [2015] EWCA Civ 144

Case No: A3/2014/1085

**IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
MR JUSTICE POPPLEWELL
[2014] EWHC 702 (Comm)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Thursday 26th February 2015

**Before :**

**LORD JUSTICE JACKSON
LORD JUSTICE KITCHIN**
and
**LORD JUSTICE FLOYD**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

|  |  |  |
|---|---|---|
| **INTEGRAL PETROLEUM S.A.** |  | **Appellant** |
| - and - |  |  |
| **SCU-FINANZ AG** |  | **Respondent** |

- - - - - - - - - - - - - - - - - - - - -
(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)
- - - - - - - - - - - - - - - - - - - - -

**Stephen Cogley QC and Peter Ferrer** (instructed by **Gentium Law Group**) for the **Appellant**
**James Collins QC** (instructed by **Thomson Webb & Corfield**) for the **Respondent**

Hearing date: 30 January 2015
- - - - - - - - - - - - - - - - - - - - -
**Judgment**

**Lord Justice Floyd :**

**Introduction**

1.  This appeal raises an issue of conflict of laws in the context of an oil trading agreement.

2.  On 17 July 2013 the claimant and appellant Integral Petroleum SA ("Integral") entered judgment in default of defence in its action for damages for breach of contract against the defendant and respondent SCU-Finanz AG ("SCU") in the sum of US$ 1,078,547 plus costs.  On 24 December 2013 SCU applied under CPR Part 13 to set that judgment aside.  By his order of 28 March 2014 Popplewell J granted SCU's application on the basis that SCU had a defence with real prospects of success, and it was appropriate to exercise the court's discretion to do so.  Integral appeals against that order, contending that the defence does not have a real prospect of success. Alternatively, even if the defence has a real prospect of success, Integral contends that the judge wrongly assessed the potency of the defence, and ought not to have exercised his discretion to allow SCU to raise it.  This, says Integral, is particularly so in view of a period of unexplained delay on the part of SCU in applying to set the default judgment aside.

3.  Integral and SCU are both Swiss companies engaged in the business of trading in oil. By a supply contract dated 18 October 2011 ("the supply contract") SCU purportedly agreed to sell and Integral purportedly agreed to buy up to 400,000 metric tons per year at the seller's option of  "*gasoil, fuel oil, naphtha, gasoline, jet, kerosene (to be specified) as usually produced by Turkmenbashi complex of refineries*".  The supply contract provided that it would be governed by English law and that the English High Court was to have exclusive jurisdiction. A number of matters were left to be specified in separate addenda to the supply contract, such as the precise product, the lifting quantities and the refinery prices on which the contract prices were to be based.

4.  Integral claimed that there had been a failure to deliver any product pursuant to the supply contract. The judge described the evidence as to what actually happened pursuant to the contract as extremely sparse.  In the end I have not found it necessary for the purposes of this judgment to delve further into that aspect of the case.

5.  The two officers of SCU were at the material time Albert Bass and Marine Vartanyan. Their names were registered and published in the Swiss Register of Commerce as *prokurists*, a term I explain further below. The entry in that Register made it clear that their power of signature was joint.  However, the supply contract was signed by Ms Vartanyan alone. It was not signed by Mr Bass, or by anyone else on behalf of SCU. Ms Vartanyan's initials were on each page and her full signature appears on the final page under the words "FOR SCU-FINANZ AG". Next to her signature is a stamp which reads "SCU SWISS CREDIT UNION".  The main issue in this case is: which system of law should be applied to determine the consequences, if any, of the facts which I have just recited?

**CPR Part 13**

6.  CPR Part 13 contains the rules for setting aside or varying judgments entered under Part 12.  Part 13.2 identifies cases where a party is entitled to have the judgment set

aside. Although SCU contended before the judge that irregularities in service brought it within CPR Part 13.2, it no longer so contends. Part 13.3 then provides for other cases:

> (1) In any other case, the court may set aside or vary a judgment entered under Part 12 if –
>
> (a) the defendant has a real prospect of successfully defending the claim; or
>
> (b) it appears to the court that there is some other good reason why –
>
> (i) the judgment should be set aside or varied; or
>
> (ii) the defendant should be allowed to defend the claim.
>
> (2) In considering whether to set aside or vary a judgment entered under Part 12, the matters to which the court must have regard include whether the person seeking to set aside the judgment made an application to do so promptly.

7. The rule was considered by this court in *Standard Bank Plc v Agrinvest International Inc.* [2010] EWCA Civ 1400. Moore Bick LJ said at paragraph 23:

> "The CPR were intended to introduce a new era in civil litigation in which both the parties and the courts were expected to pay more attention to promoting efficiency and avoiding delay. The overriding objective expressly recognised for the first time the importance of ensuring that cases are dealt with expeditiously and fairly and it is that context that one finds for the first time in rule 13.3(2) an explicit requirement for the court to have regard on an application of this kind to whether the application was made promptly. No other factor is specifically identified for consideration, which suggests promptness now carries much greater weight than before. It is not a condition that must be satisfied before the court can grant relief, because other factors may carry sufficient weight to persuade the court that relief should be granted, even though the application was not made promptly. The strength of the defence may well be one. However, promptness will always be a factor of considerable significance, as the judge recognised in paragraph 27 of his judgment, and if there has been a marked failure to make the application promptly, the court may well be justified in refusing relief, notwithstanding the possibility that the defendant might succeed at trial."

8. Thus although promptness is to carry "considerable significance", a lack of promptness may be outweighed by other factors. Mr Cogley QC, who appeared for

Integral, did not seek to persuade us that the potency of the defence was not a relevant factor. It is.

9. This court will not interfere with the exercise of a judge's discretion to set aside, or to refuse to set aside a default judgment if he or she applies these principles.

**The defences relied on and the issues in the appeal**

10. SCU relied on three defences for the purposes of its application. These were:

    <u>Defence (i)</u>: that the contract was not binding on SCU because it bears only one of the two authorised signatures required by Swiss law;

    <u>Defence (ii)</u>: that Integral had failed to open a letter of credit as required by the contract which was a condition precedent to any liability on the part of SCU to deliver the product; and

    <u>Defence (iii)</u>: that the loss claimed raises issues of quantification, or is excluded by a limitation of liability clause in the contract.

11. Popplewell J found that SCU's defence (i) was, on the evidence of Swiss law available, a defence which was bound to succeed. Integral says that the judge was wrong to conclude that SCU was bound to succeed on this issue. It contends, to the contrary, that Integral will succeed on this issue, or alternatively that the judge assessed the strength of the defence too generously. Defence (i) is thus the main focus of the argument in the present case. As to defence (ii) the judge found that the time for Integral to open a letter of credit had not yet arisen. SCU do not seek to disturb the judge's conclusion on this point in this appeal. In relation to defence (iii), the judge held that it justified setting aside the judgment and entering instead judgment for damages to be assessed "if it be appropriate to exercise discretion to grant relief under CPR 13.3 at all".

12. In exercising his discretion under rule 13.3, the judge took account of the following factors:

    i) The potency of defence (i), namely that he considered it bound to succeed on the evidence before him.

    ii) The fact that in order to obtain the judgment in default, Integral had themselves acted in breach of the rules. In particular they had filed a certificate of service stating that the Particulars of Claim had been served in accordance with the rules, when this was not true. Although no conscious impropriety was involved, it was a culpable error. Integral had also served the Particulars of Claim by email, which was also in error, as its representatives should have known. The judge found that, in the circumstances of this case, the claimant could not and would not have obtained the judgment if it had complied with the rules.

    iii) The unexplained delay by SCU in making its application. The judge had earlier found that SCU became aware of the default judgment on 13 September 2013, but its solicitors had not written to Integral's solicitors until 6 December 2013: a period of nearly 3 months.

13. By a respondent's notice SCU seeks to uphold the decision of Popplewell J on the basis of an additional defence not raised before the judge, namely that the supply contract was incomplete and insufficiently certain to give rise to a binding contract. Mr Collins QC recognises that he can only deploy this further defence if we were to decide that the judge's exercise of discretion was flawed and we embarked on the exercise of discretion *de novo*. This might be the case, for example, if we considered that the judge had materially erred in his assessment of the potency of defence (i). In the event I have not found it necessary to consider this further defence.

**The evidence of Swiss law**

14. The relevant Swiss law was set out by the judge in paragraph [47] of his judgment as follows and is not disputed for the purposes of this appeal:

> "1) In order for companies to effect legal transactions, representatives must be authorised to create rights and obligations on behalf of the company by their signature. In Swiss law this function is primarily fulfilled by one or more "prokurists" who hold this general representation power, call the "prokura".
>
> (2) Article 458 of the Code of Obligations, which is part of the Swiss Civil Code, defines the holder of a prokura as a person who is expressly or impliedly authorised by the proprietor of a trading manufacturing or similar business enterprise to conduct the business and to sign for the business "per procura".
>
> (3) Under Article 459, as regards third parties acting in good faith, prokurists are deemed to be authorised to bind the principal in all types of legal transactions on its behalf which may be within the objectives of the trade or business of the principal.
>
> (4) A restriction on this broad authority vested in the prokurist is only possible in two ways (save in relation to real property). The first is by limiting the authority to the business area of a branch. The second is by prescribing that joint signature is required. Those permitted limitations are reflected in Article 460 of the Code of Obligations which provides in terms that where a prokura is issued in favour of more than one person, all are required to sign together as joint signatories, and the signature of one alone without the prescribed signature of the others is not binding.
>
> (5) There is a Swiss Register of Commerce, whose main function is to publicise certain matters relating to business enterprises. The prokura is effective upon registration in the Register. The entry specifies the extent and type of the prokura. In particular, it will identify whether the signatory power is joint such that by virtue of Article 460 the single signature of one is insufficient to bind the company.

> (6) Publication in the Register is intended to give anyone who may be interested information concerning the factual and legal circumstances which relate to the business enterprise, including amongst other things the persons authorised to represent it. The legal effect of registration in the Register of Commerce is set out in Article 933(1) of the Code of Obligations: entries in the Register are considered express notice to third parties as a matter of record, such that a person cannot assert lack of knowledge of a matter validly registered. A correct entry in the Register of Commerce is not contestable and serves as effective worldwide notice for the purposes of Swiss law. It is not possible to invoke a concept of excusable ignorance."

**The conflicts rules**

15. In *Raiffeisen Zentralbank Österreich AG v Five Star Trading LLC and others* [2001] EWCA Civ 68; [2001] QB 825, Mance LJ (as he then was) summarised the approach of the courts to resolution of conflicts issues in the following way:

    > "26. Both parties accept that, at common law, the identification of the appropriate law may be viewed as involving a three-stage process: (1) characterisation of the relevant issue; (2) selection of the rule of conflict of laws which lays down a connecting factor for that issue; and (3) identification of the system of law which is tied by that connecting factor to that issue: see Macmillan Inc. v. Bishopsgate Investment Trust Plc [1996] 1 WLR 387, 391-2 per Staughton LJ. The process falls to be undertaken in a broad internationalist spirit in accordance with the principles of conflict of laws of the forum, here England.
    >
    > 27. While it is convenient to identify this three-stage process, it does not follow that courts, at the first stage, can or should ignore the effect at the second stage of characterising an issue in a particular way. The overall aim is to identify the most *appropriate* law to govern a particular issue. The classes or categories of issue which the law recognises at the first stage are man-made, not natural. They have no inherent value, beyond their purpose in assisting to select the most appropriate law. A mechanistic application, without regard to the consequences, would conflict with the purpose for which they were conceived. They may require redefinition or modification, or new categories may have to be recognised accompanied by new rules at stage 2, if this is necessary to achieve the overall aim of identifying the most appropriate law …"

16. It will be appreciated, therefore, that an important first step is the correct characterisation of the issue which divides the parties.

17. So far as selection of the relevant rule of conflict of laws is concerned, Article 11 of Regulation (EC) No 593/2008 of the European Parliament and of the Council of

17 June 2008 on the law applicable to contractual obligations ("the Rome I Regulation"), on which Integral relies as its primary case, provides:

**"Formal validity**

1. A contract concluded between persons who, or whose agents, are in the same country at the time of its conclusion is formally valid if it satisfies the formal requirements of the law which governs it in substance under this Regulation or of the law of the country where it is concluded.

2. A contract concluded between persons who, or whose agents, are in different countries at the time of its conclusion is formally valid if it satisfies the formal requirements of the law which governs it in substance under this Regulation, or of the law of either of the countries where either of the parties or their agent is present at the time of conclusion, or of the law of the country where either of the parties had his habitual residence at that time.

3. A unilateral act intended to have legal effect relating to an existing or contemplated contract is formally valid if it satisfies the formal requirements of the law which governs or would govern the contract in substance under this Regulation, or of the law of the country where the act was done, or of the law of the country where the person by whom it was done had his habitual residence at that time."

18. Formal validity is contrasted with material validity, which is the subject of Article 10. It is common ground that a report for the Rome Convention which preceded the Rome I Regulation prepared by Mario Giuliano and Paul Lagarde ("Giuliano/Lagarde") is an admissible aid to construction of the Regulation. The report first notes that the relevant Article:

> "does not define what is to be understood by the 'formal validity' of acts. It seemed realistic to leave open this difficult problem of definition …"

19. Notwithstanding the decision to leave open the definition, Giuliano/Lagarde continues:

> "It is nevertheless permissible to consider 'form' … as including every external manifestation required on the part of a person expressing the will to be legally bound, and in the absence of which such expression of will would not be regarded as fully effective. This definition does not include the special requirements which have to be fulfilled where there are persons under a disability to be protected, such as the need in French law for the consent of a family council to an act for the benefit of a minor, or where an act is to be valid against third

    parties, for example the need in English law for a notice of statutory assignment of a chose in action."

20.  Later the authors give an example of formal validity:

    "It is clear that there are numerous requirements as to formal validity which are laid down with regard to the contract itself, taken as a whole and not stage by stage. This is the case where, for example, two signatures are required or where contracts are to be made in duplicate."

21.  The authors of *Dicey, Morris & Collins*: The Conflict of Laws 15th Edition ("*Dicey*") opine at 32-130 that formal validity:

    "includes such matters as the method of execution of documents, the affixing of a seal, the presence of witnesses or certification by a notary".

22.  The Rome I Regulation excludes certain questions from its scope. Article 1(2) of the Rome I Regulation provides:

    "The following shall be excluded from the scope of this Regulation:

    …

    (f) questions governed by the law of companies and other bodies corporate or unincorporated, such as the creation, by registration or otherwise, legal capacity, internal organisation or winding-up of companies and other bodies, corporate or unincorporated, and the personal liability of officers and members as such for the obligations of the company or body;

    (g) the question whether an agent is able to bind a principal, or an organ to bind a company or other body corporate or unincorporated in relation to a third party;

    …"

23.  It will also be necessary to refer to Article 20 of the Rome I Regulation which excludes *renvoi*:

      "Exclusion of *renvoi*

    The application of the law of any country specified by this Regulation means the application of the rules of law in force in that country other than its rules of private international law, unless provided otherwise in this Regulation."

24.  Integral has an alternative case based on The Overseas Companies (Execution of Documents and Registration of Charges) Regulations 2009 ("the 2009 Regulations").

25. The 2009 Regulations modify the effect of sections 43 and 44 of the Companies Act 2006. Paragraph 4 is entitled "Formalities of doing business under the law of England & Wales and Northern Ireland" and modifies sections 43 and 44 of the Companies Act 2006 so that they read as follows:

> "Sections 43, 44 and 46 of the Companies Act 2006 apply to overseas companies, modified so that they read as follows-
>
> Company Contracts
>
> 43.-(1) Under the law of England and Wales or Northern Ireland a contract may be made-
>
> > (a) by an overseas company, by writing under its common seal or in any manner permitted by the laws of the territory in which the company is incorporated for the execution of documents by such a company, and
> >
> > (b) on behalf of an overseas company, by any person who, in accordance with the laws of the territory in which the company is incorporated, is acting under the authority (express or implied) of that company.
>
> (2) Any formalities required by law in the case of a contract made by an individual also apply, unless a contrary intention appears, to a contract made by or on behalf of an overseas company.
>
> Execution of documents
>
> 44.-(1) Under the law of England and Wales or Northern Ireland a document is executed by an overseas company-
>
> > (a) by the affixing of its common seal, or
> >
> > (b) if it is executed in any manner permitted by the laws of the territory in which the company is incorporated for the execution of documents by such company.
>
> (2) A document which-
>
> > (a) is signed by a person who, in accordance with the laws of the territory in which an overseas company is incorporated, is acting under the authority (express or implied) of the company, and
> >
> > (b) is expressed (in whatever form of words) to be executed by the company, has the same effect in relation to that company as it would have in relation to a company incorporated in England and Wales or Northern Ireland if executed under the common seal of a company so incorporated.

> (3) in favour of a purchaser a document is deemed to have been duly executed by an overseas company if it purports to be signed in accordance with subsection (2).
>
> A "purchaser" means a purchaser in good faith for valuable consideration and includes a lessee, mortgagee or other person who for valuable consideration acquires an interest in property.
>
> (4) Where a document is to be signed by a person on behalf of more than one overseas company, it is not duly signed by that person for the purposes of this section unless he signs it separately in each capacity.
>
> (5) References in this section to a document being (or purporting to be) signed by a person who, in accordance with the laws of the territory in which an overseas company is incorporated, is acting under the authority (express or implied) of the company are to be read, in a case where that person is a firm, as references to its being (or purporting to be) signed by an individual authorised by that firm to sign on its behalf.
>
> (6) This section applies to a document that is (or purports to be) executed by an overseas company in the name of or on behalf of another person whether or not that person is also an overseas company."

26. These provisions apply to overseas companies whether or not they have established a place of business in England & Wales or Northern Ireland.

27. SCU, for its part, relies on Rule 175 in *Dicey*. Rule 175 is concerned with the capacity of corporations to enter into transactions as well as matters concerning the constitution of a corporation. It provides:

> "(1) The capacity of a corporation to enter into any legal transaction is governed both by the constitution of the corporation and by the law of the country which governs the transaction in question.
>
> "(2) all matters concerning the constitution of a corporation are governed by the law of the place of incorporation."

28. In *Haugesund Kommune and Another v Depfa ACS Bank (Wickborg Rein and Co part 20 defendant)* [2012] QB 549 a majority of the Court of Appeal held that both the terms "capacity" and "company's constitution" in this context were to be given a broad internationalist meaning: see Aikens LJ at [47] and [48]. Thus, in that case, a lack of substantive power to enter into a contract of a particular type was to be regarded as a lack of capacity despite the fact that the lack of the relevant power was imposed by national legislation rather than the internal instruments of the company.

29. In the commentary which follows Rule 175 the learned authors of *Dicey,* at paragraph 30-028, comment that:

> "The principle of Rule 175(2) has been increasingly accepted by the authorities. The cases at least establish that the law of the place of incorporation determines the composition and powers of the various organs of the corporation, whether directors have been validly appointed, the nature and extent of the duties owed by the directors to the corporation, and who are the corporation's officials authorised to act on its behalf …"

30. Thus, by way of example, in *Carl-Zeiss Stiftung v Rayner & Keeler Ltd (No 2)* [1967] 1 AC 853 the House of Lords held that the issue of whether an action in the English court had been properly authorised by a foreign entity was to be decided according to the law in place at the place of incorporation of the entity: see Lord Wilberforce at 972 E-F.

31. SCU also points to Rule 244 of *Dicey* which deals with the ability of agents to bind a principal:

> "(1) The issue whether the agent is able to bind the principal to a contract with a third party … is governed by the law which would govern that contract … if the agent's authority was established
>
> (2) The existence and scope of the agent's actual authority to represent the principal, where relevant under the law which applies by virtue of clause 1 of this Rule, are to be determined having regard to the law applicable to the relationship between principal and agent, as determined under Rule 243."

32. The authors explain at paragraph 33-451:

> "In applying clause (2) of this Rule [Rule 244 which provides that the existence and scope of an agent's actual authority is governed by the law applicable to the relationship between principal and agent] the concept of "the law applicable to the relationship between principal and agent" must here be understood as including the law of the place of incorporation or formation of the company or other body corporate. Although in most cases a contractual relationship will exist between a corporation and an agent who seeks to conclude a contract upon its behalf (e.g. a contract of employment or a director's service contract), the source of the agent's (actual) authority to represent the corporation must ultimately derive from the law of the place of incorporation, which regulates the company's capacity and internal management, including the identification of the persons authorised to act on the corporation's behalf. For example, if a company's constitution provides that contracts above a particular value may only be entered into by a director, an employee who does not hold that position should not be considered to have actual authority even if his contract of employment is governed by a different law, under which no similar restriction exists. Similarly, if a mandatory provision of

>   the company's legislation of the law of the place of incorporation requires that entry into a particular category of contract requires a resolution of the board of directors, no person can be considered to have actual authority without that resolution."

**The arguments on this appeal**

33. Mr Cogley QC for Integral submits that the issue should be characterised as whether the contract is invalid for want of a second signature. He emphasises the absence of any other arguable defences. It is not said, for example, that SCU had not internally resolved to enter into the contract. If one asks the question "why is the contract not binding?" the answer is, and is only, the absence of a second signature. Nothing else prevented this contract from binding SCU. That issue, submits Mr Cogley, is correctly characterised as an issue of formal validity, bringing Article 11 of the Rome I Regulation into play.

34. Mr Cogley submits that formal validity, as that term is used in the Rome I Regulation, must be given a meaning in accordance with Giuliano/Lagarde's tentatively proffered definition, a specific example of which is a requirement for two signatures. Accordingly, he submits that the issue is governed by English law, which is the law which governs the contract in substance.

35. Mr Cogley further submits that this conclusion is reinforced by Article 20 of the Rome I Regulation which excludes *renvoi*. He submits that any decision that the issue is governed by Swiss law creates a form of *renvoi*. He submits that, in a contract governed by English law according to the choice of the parties, it is anomalous that the parties should nevertheless be pointed back to a foreign system of law to determine whether the contract has been validly executed. He postulated examples of exotic requirements imposed by foreign law as to how signatories must behave when signing documents and pointed to the uncommercial results if contracting parties had to check whether these requirements had been satisfied.

36. Mr Collins QC for SCU submits that the issue to be decided is whether SCU can contract by means of the signature of a single prokurist. This is a question of the company's "capacity" governed by its constitution, or more accurately whether the acts of a single prokurist can be attributed to SCU. If they are right about the characterisation of the issue, then SCU submits that the relevant conflict of laws rule dictates that the issue is to be governed by the law of the company's constitution.

37. Mr Collins QC relies, as did the judge, on Lord Hoffmann's exposition of the domestic rules by which one determines whether acts can be attributed to a company in *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500 at 506B-G:

>   "Any proposition about a company necessarily involves a reference to a set of rules. A company exists because there is a rule (usually in a statute) which says that a persona ficta shall be deemed to exist and to have certain of the powers, rights and duties of a natural person. But there would be little sense in deeming such a persona ficta to exist unless there were also

> rules to tell one what acts were to count as acts of the company. It is therefore a necessary part of corporate personality that there should be rules by which acts are attributed to the company. These may be called "the rules of attribution."
>
> The company's primary rules of attribution will generally be found in its constitution, typically the articles of association, and will say things such as "for the purpose of appointing members of the board, a majority vote of the shareholders shall be a decision of the company" or "the decisions of the board in managing the company's business shall be the decisions of the company." There are also primary rules of attribution which are not expressly stated in the articles but implied by company law, such as
>
> "the unanimous decision of all the shareholders in a solvent company about anything which the company under its memorandum of association has power to do shall be the decision of the company:" *see Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258.*
>
> These primary rules of attribution are obviously not enough to enable a company to go out into the world and do business. Not every act on behalf of the company could be expected to be the subject of a resolution of the board or a unanimous decision of the shareholders. The company therefore builds upon the primary rules of attribution by using general rules of attribution which are equally available to natural persons, namely, the principles of agency. It will appoint servants and agents whose acts, by a combination of the general principles of agency and the company's primary rules of attribution, count as the acts of the company. And having done so, it will also make itself subject to the general rules by which liability for the acts of others can be attributed to natural persons, such as estoppel or ostensible authority in contract and vicarious liability in tort."

38. Thus, says Mr Collins, the question here is whether Ms Vartanyan's act in signing the contract "*counts as the act of the company*". Mr Collins drew the distinction between a case where the issue was whether Ms Vartanyan could bind herself as a named party and a case (which he submits is this one) where the issue is whether she can bind another person, namely SCU. In the former case, there is, it is to be assumed, no requirement of Swiss law which prevents her own signature from binding her. No question of authority or attribution arises in such a case. In the latter case one has to ask the question whether Ms Vartanyan's sole act can be attributed to the company. That is not a matter of mere formal validity of the contract. It is an issue to which *Dicey*'s Rules 175 or 244 apply.

*Discussion*

39. In my judgment, SCU is correct, as was the judge, on the question of the correct characterisation of the issue between the parties. The issue is one of the authority of a single prokurist to bind the company. That is a matter for the company's constitution, as broadly interpreted, and is not governed by the Rome I Regulation, but instead by the common law principles set out in Dicey. Application of the relevant conflicts rules provides that the issue is governed by Swiss law, the place of SCU's incorporation. The answer to the issue is that a single prokurist cannot bind this company.

40. I do not accept Mr Cogley's argument based on the Rome I Regulation and on Giuliano/Lagarde. Firstly, Giuliano/Lagarde's tentatively proposed definition - "*every external manifestation required on the part of a person expressing the will to be legally bound, and in the absence of which such expression of will would not be regarded as fully effective*" – seems to me to assume an expression of the will to be legally bound. This definition is relatively easy to apply in the case of a natural person: there are numerous ways in which an individual can express the will legally to bind himself, and questions of his authority to do so will not arise. In the case of a corporation it is not easy to imagine what such an expression of will might consist of. A company can only act through natural persons, duly authorised to act on its behalf, and its ability to express its will is limited by the authority of those representing it.

41. Thus, following the Giuliano/Lagarde definition, an individual's offer to become legally bound could be made subject to a requirement, such as the signature of a witness, which would then be a matter of formal validity within Article 11 of Rome I. In the case of a company, however, a prior question arises as to whether the company has validly expressed the will to be legally bound at all. If its agent has no actual or ostensible authority, it will not in general have expressed that will.

42. I agree with Mr Collins that Giuiano/Lagarde's example of a "requirement for two signatures" is not entirely clear. Because we are concerned with a case where the local law requires two signatures before the company is legally bound, there is a danger of jumping to the conclusion that this is what is meant. However the authors may have had in mind a requirement for the contracting party to sign in two places, or for a witness to sign in addition to the contracting party. Those examples would involve a clear, prior expression of the will to be legally bound. The missing act is one which has no relevance in relation to the expression of will to be legally bound, but is required for formal validity.

43. The present case is, as Jackson LJ suggested in argument, closer to Giuliano/Lagarde's example of a person under a disability, who may require the signature of a mentally capable party to create an enforceable legal obligation. As the authors of the report recognise, this example would not be covered by their definition of formal validity. The missing act is one which has real substance in relation to the expression of will to be legally bound.

44. This interpretation of Article 11 of the Rome I Regulation is consistent with the language of Article 11(1) and (2) both of which commence with the words "*A contract concluded between persons … is valid if…*". Those words seem to me to carry with them the idea that the contract has in substance been concluded (save, by implication, for some alleged lack of formal validity). Those words would be

inappropriate to cover a case, for example, where the person purportedly concluding a contract on behalf of another had no authority to do so at all.

45. In the present case the absence of the signature of Mr Bass cannot be regarded as going only to formal validity. A sole prokurist has no actual authority to bind the company. It cannot be assumed that the second prokurist would be prepared to sign. By contrast it can, for example, be assumed that a person would be able to obtain a witness to his or her signature, or sign again in a second place.

46. However, even if that interpretation of "formal validity" is incorrect, and formal validity has the wider meaning for which Mr Cogley contends, then I consider that Article 1(2) of the Rome I Regulation still excludes the present issue from the scope of the Regulation. Article 1(2) carves out of the Rome I Regulation a class of issues which includes the issue in this case. I cannot accept Mr Cogley's submission that these exclusionary provisions are merely declaratory, so that if the issue can be brought within one of the substantive Articles of the Regulation, then the exclusion has no effect. The matters referred to in 1(2)(f) were apparently excluded from the Regulation because of work being done on harmonisation of substantive law: see *Dicey* at 30-029. Thus even if the ability of Ms Vartanyan's sole signature to bind the company could be brought within Article 11, it would in my judgment be excluded by Article 1(2)(f) and/or (g).

47. I have not overlooked Mr Cogley's submission that it is uncommercial to require parties who have made a choice of law to look to, and have in mind, the detailed requirements of a foreign law to see whether a contract which appears to have the attributes of a concluded contract is entered into with the authority of one of the parties. However, apart from the 2009 Regulations to which I will have to come shortly, Mr Cogley does not offer us any route to a more convenient result than Article 11 of the Rome I Regulation. It is simply not possible to read that Article as extending to an issue of whether an officer or agent is authorised to act on behalf of a company, and, even if it were, Article 1(2) has expressly excluded such an issue from its scope.

48. I do not think that Article 20 of Rome I, the exclusion of *renvoi*, assists here either. The effect of Article 20, in a case where the Rome I Regulation prescribes the law which governs the substance of the contract, is that English law will apply without its own, domestic rules of private international law. Where the Rome I Regulation does not apply, or does not prescribe English law, then we have no choice but to apply our own rules of private international law.

49. Mr Cogley goes on to submit that even if he is wrong thus far and the issue either does not fall within Article 11 or is excluded by Article 1(2) of the Rome I Regulation, then it is still not established that Swiss law applies. He says that it is then a matter of the common law, subject to its modification by any relevant legislation. For this he relies on the Section 44(3) of the Companies Act 2006 as modified by the 2009 Regulations.

50. Mr Cogley recognises that the supply contract cannot, at least for the purposes of this argument, be said to be executed in accordance with section 44(2), as that subsection requires the contract to be signed by a person who, in accordance with the laws of the company's incorporation, is acting under the authority of the company. However, he

submits that Integral fulfils the definition of "a purchaser", and that therefore the contract in the present case is deemed to have been duly executed because it "purports" to be signed in accordance with section 44(2). He submits that it is no answer to say that Ms Vartanyan was not authorised in fact under Swiss law because she only had joint authority.

51. Mr Collins submits that the 2009 Regulations have no application to the present case where the issue is whether the signatory had actual authority to sign. He submits that the regulations are concerned only with issues of formalities of execution. He goes on to submit that the 2009 Regulations, even if applicable, do not assist Integral.

52. It is not necessary to express a concluded view on the first point, although it gains support from the analysis of Hamblen J in *Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi AS* v *VSL Steel Co Ltd* [2013] EWHC 4071 (Comm) at [122] to [130]. However, I accept the second of Mr Collins' points on the application of the Regulations to this case. I cannot see how on the present evidence it can be suggested that the contract here purported to be signed by a person who, in accordance with Swiss law, was acting under the authority (express or implied) of SCU. To determine that question it is necessary to ask oneself what the requirements of Swiss law are and whether the contract purported to be signed in accordance with them. Swiss law requires the signature of the two prokurists, and the document did not purport to be so signed.

53. That this is the intended effect of the modified sections enacted by the 2009 Regulations is supported by the terms of the unamended sections of the Companies Act 2006. Thus section 44 of that Act provides:

> 44 Execution of documents
>
> (1) Under the law of England and Wales or Northern Ireland a document is executed by a company—
>
>   (a) by the affixing of its common seal, or
>
>   (b) by signature in accordance with the following provisions.
>
> (2) A document is validly executed by a company if it is signed on behalf of the company—
>
>   (a) by two authorised signatories, or
>
>   (b) by a director of the company in the presence of a witness who attests the signature.
>
> (3) The following are "authorised signatories" for the purposes of subsection (2)—
>
>   (a) every director of the company, and
>
>   (b) in the case of a private company with a secretary or a public company, the secretary (or any joint secretary) of the company.

> (4) A document signed in accordance with subsection (2) and expressed, in whatever words, to be executed by the company has the same effect as if executed under the common seal of the company.
>
> (5) In favour of a purchaser a document is deemed to have been duly executed by a company if it purports to be signed in accordance with subsection (2).
>
> A "purchaser" means a purchaser in good faith for valuable consideration and includes a lessee, mortgagee or other person who for valuable consideration acquires an interest in property.

54. Under this provision, therefore, a contract will be deemed to have been duly executed if it purports to be signed by two authorised signatories, or by a director in the presence of a witness who attests the signature. In the absence of anything further, a contract signed by only one authorised signatory, or by a director without a witness, would not purport to be signed in accordance with subsection (2).

55. Mr Cogley submitted, finally, that the result of this approach is that the Regulations are of very limited scope. That may be correct, but I do not consider that this observation should lead one to adopt a meaning which is not in accordance with the express language of the Regulation.

56. I would accordingly reject, as did the judge, the argument based on the 2009 Regulations as well.

**Discretion**

57. Mr Cogley recognises that if he cannot disturb the judge's conclusion that defence (i) is, on the present evidence, bound to succeed, then he also cannot fault the judge's exercise of his discretion to set aside the judgment.

58. Because I think the judge was right for the reasons he gave, it is not necessary to consider any further the exercise of discretion, or the relevance if any of the newly raised defence.

**Conclusion**

59. For the reasons I have given, I would dismiss this appeal.

**Lord Justice Kitchin**

60. I agree.

**Lord Justice Jackson**

61. I also agree.